IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| INSURANCE AGENCY OF BEAVER CROSSING, INC., | ) ) ) | |
| Plaintiff, | ) ) | 4:02CV3093 |
| v. | ) ) | |
| UNITED STATES OF AMERICA and COMMODITY CREDIT CORPORATION, an agency of the United States of America within the Department of Agriculture. | ) ) ) ) ) ) | MEMORANDUM OPINION |
| Defendants. | ) ) | |

The plaintiff, Insurance Agency of Beaver Crossing, Inc. ("Beaver Crossing"), commenced this action against the United States of America and the Commodity Credit Corporation ("the CCC"), an agency within the United States Department of Agriculture ("the USDA"), under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, seeking damages for negligence and private nuisance.[1]  Beaver Crossing alleges that the CCC, which operated a grain storage facility across from Beaver Crossing's farmland ("the Property") from approximately 1950-1974, negligently handled grain fumigants containing carbon tetrachloride ("CT") so as to allow the CT to migrate through the

---

[1] Beaver Crossing's amended complaint also asserted claims against the government for inverse condemnation and trespass.  Both of these claims have since been dismissed (*See* Filing Nos. 23 & 85).

soil and contaminate the shallow aquifer below Beaver Crossing's farmland.

A trial to the Court, sitting without a jury, was held on May 15-18, 2006.  The Court, having considered the evidence, the briefs and arguments of counsel, and the applicable law, hereby enters the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

### FINDINGS OF FACT

**A.   The USDA Commodity Credit Corporation – An Overview**

The USDA Commodity Credit Corporation is a government-owned and operated entity that was created to stabilize, support, and protect farm income and prices.  The CCC also helps maintain balanced and adequate supplies of agricultural commodities and aids in their orderly distribution.  The CCC was originally incorporated in Delaware in 1933, but was transferred to the USDA in 1939 and reincorporated in 1948 as a federal corporation within the USDA.[2]

In the late 1940's, the CCC initiated a large-scale grain bin construction program to store surplus grain where privately owned storage facilities were inadequate, due to metal and lumber shortages induced by World War II (Ex. 21).  At its peak during the 1950's, the CCC operated grain storage facilities on leased property at several thousand locations nationwide.  The

---

[2] *See* http://www.fsa.usda.gov/pas/publications/facts/html/ccc99.htm..

storage bin program was terminated in the 1970's and all existing grain bins and equipment were sold, generally to local farmers. CCC records relating to the storage and fumigation of grain stored in the bins were not retained following termination of the program (*Id.*).

From approximately 1950 to 1974, the CCC operated a grain storage facility in Milford, Nebraska ("the Milford Facility" or "the Facility").  The former Milford Facility is located approximately one and one-quarter mile south of Milford, Nebraska on Tech School Road (Ex. 9 at 1).  The Facility encompassed 4.6 acres, consisting of relatively flat terrain sloping gently to the east (*Id*. at 2).  The Big Blue River flows south approximately one-half mile east of the site and an intermittent stream flows east approximately one-quarter mile south of the Facility (*Id.*).  During its operation, the Milford Facility had ten (10) large quonset huts, sixteen (16) circular bins, and two (2) unidentified buildings (*Id*. at 1-7).  Today, the only structures remaining at the former Facility, are the two most easternly located quonset huts (*Id.*).

    B.    **Beaver Crossing's Property**

In 1991, Beaver Crossing, by and through its president, Gerry Dunlap, purchased a large parcel of real property located across Tech School Road to the east of the former Milford Facility.  The Property consists of approximately 200 acres, 178

of which are farmed.  The Property, which currently does not have a well, is irrigated with water pumped from the Big Blue River.  There is currently no residence located on the Property.

**C.   Carbon Tetrachloride and Grain Fumigation Generally**

To preserve stored grain at the former Milford Facility, as well as other former CCC facilities nationwide, CCC employees commonly fumigated the grain with commercial grain fumigants containing CT (Ex. 21).  CT is a clear, colorless, volatile liquid that is denser than water (Ex. 42 at 4).  Early on, CT, which must be synthetically produced, was widely used as a dry cleaning and degreasing agent (Ex. 6 at 2).  By as early as 1938, however, CT, upon the USDA's recommendation, was also being used as a commercial grain fumigant (Ex. 38).  During the years the CCC storage bin program was operated, the USDA issued several publications, including the CCC Grain and Property Maintenance Handbook ("the CCC Handbook"), recommending the use of commercial grain fumigants containing CT (Exs. 39 at ¶¶ 46-50; 40 at pp. 6-7; and 41 at pp. 5-6).

Generally, to fumigate stored grain, CT, in its liquid form, was applied to a running grain stream at the opening of a bin that was being filled or by surface application on a stationary bin or bulk of grain (Ex. 46 at 1).  The CT then volatilized "to form toxic, heavier-than-air vapors, which by diffusion, penetration, and sorption," permeated all sections of

the grain mass with uniformity in a few hours (*Id.*).  In sufficient concentrations, the CT would asphyxiate all stages of insect life within three to four days (*Id.*).

Insects, however, were not the only problem grain bin operators had to combat.  Grain storage structures also attracted rodents, which if left undisturbed, would consume and contaminate tremendous amounts of grain (Ex. 278, Amend. 6, ¶ 42).  The rodents traditionally infested the foundations and lower portions of the storage structures and would gain access to the grain through spaces between fan blades (*Id*. at ¶ 44A).  To combat rodent infestation, the CCC Handbook, recommended, *inter alia*, fumigating underground rodent burrows with calcium cyanide or other poisonous gases (*Id*. at ¶ 44B).

In 1985, the use of CT as a grain fumigant was banned by the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136, *et seq*., as amended.

**D.   CT Groundwater Contamination in Milford, Nebraska**

In September, 1995, CT groundwater contamination was detected in a domestic drinking water well ("the Trojan well") located approximately 300 feet east of the former Milford Facility by the Nebraska Department of Health and Human Services ("HHS") (Ex. 20 at 1-1).  Subsequent sampling of private wells in the area by the Nebraska Department of Environmental Quality ("NDEQ") confirmed the finding of CT in the Trojan well and also

found low levels of CT in a livestock well ("the Troyer well") about 1,200 feet northeast of the Milford Facility (*Id.*).

In the summer of 1999, the USDA, through the Environmental Research Division of the Argonne National Laboratory ("Argonne"), began a phased environmental investigation in Milford, Nebraska, to assess the extent of the CT contamination and determine whether corrective action was required (Ex. 24 at 1-1).  Phase I of the investigation, which was performed from June-July, 1999, focused on the basic geologic and hydrogeologic setting of the local groundwater system.  As a result of the Phase I investigation, Argonne reached two important conclusions:  (1) that the Milford, Nebraska, groundwater system consists of two hydraulically separate aquifers:  a Pleistocene aquifer ("the shallow aquifer") and a Dakota aquifer ("the deeper aquifer"); and (2) that the CT contamination near the Milford Facility and surrounding area is restricted to the shallow aquifer (*Id.*).

Phase II of the investigation, which began in September, 1999, and continued into April, 2003, was designed to (1) define and delineate the soil source of contamination; (2) assess the probability that a continuing soil source for groundwater contamination exists at the former CCC facility; (3) calculate the threat to human health due to potential exposure to contaminated shallow soils; and (4) delineate the lateral and

-6-

vertical extent of the groundwater plume (*Id*. at 1-2).  As a result of the Phase II study, Argonne reached the following conclusions:  (1) residual concentrations of CT were identified in shallow soils in both the western and eastern portions of the former Milford facility, with the level being highest near the two quonset huts that remain on the property; (2) that no unacceptable health risk is associated with direct exposure to the CT contamination in soils at the former Facility; (3) that the residual concentrations confirm an association of CT contamination with the soils at the former Milford facility; (4) that CT concentrations found in the eastern subsurface soils and groundwater indicate that a probable continuing soil source of CT to the groundwater remains at the former Facility; and (5) that the groundwater within the shallow aquifer is contaminated by CT, which forms a broad plume originating beneath the former Milford Facility and extending eastward beneath Beaver Crossing's Property to within several hundred feet of the Big Blue River (*Id*. at 5-1 & 5-2).  According to the Environmental Protection Agency's Superfund website, as of January, 2006, there is no remedial action planned for the Milford site (Ex. 25).

     Beaver Crossing commenced this lawsuit in the summer of 2002, seeking damages for negligence and private nuisance.  Beaver Crossing's bases for its negligence claim against the government are summarized by two basic theories: (1) that CCC

employees at the former Milford Facility used CT to fumigate rodent burrows and that such use was negligent because CT manufacturers' instructions did not contemplate using CT for burrow fumigation; and (2) that CCC employees negligently disposed of CT at the Milford Facility in such a manner that groundwater contamination should have been anticipated by the CCC.  Beaver Crossing also alleges that the CCC's negligent use of CT for burrow fumigation caused groundwater contamination that has created a continuing, private nuisance, interfering with Beaver Crossing's use and enjoyment of its Property.  Beaver Crossing seeks damages to install and operate a well in the deeper, uncontaminated aquifer and for the diminution in property value caused by the contamination.

The government has asserted various defenses to liability, arguing, *inter alia*, that the discretionary function exception to the Federal Tort Claims Act deprives the Court of subject matter jurisdiction over plaintiff's claims and that the government cannot be liable under the Federal Tort Claims Act because there is no evidence of governmental negligence in this case.

**CONCLUSIONS OF LAW**

**A.   Beaver Crossing's Negligent Disposal Claim**

Before addressing the government's jurisdictional argument, the Court would like to briefly address Beaver

Crossing's negligent disposal claim.  Beaver Crossing alleges that the CCC negligently disposed of CT at the Milford Facility in such a manner that groundwater contamination should have been anticipated by the CCC.  In support of this contention, Beaver Crossing relies on leaflets issued by the USDA in 1966 and 1971 that contained precautions against dumping excess insecticides or fumigants near lakes, streams, or ponds and which stated that empty pesticide containers should be buried at a sanitary landfill dump or crushed and buried in level, isolated place (Exs. 40 at 8; 41 at 8).  Beaver Crossing, however, has failed to present any evidence as to how CT containers were disposed of at the Milford Facility or at former CCC facilities generally.  While CT was undisputably used at the Milford Facility for several years, and empty CT containers would have consequently been disposed of in some manner, this conclusion alone is insufficient to support Beaver Crossing's negligent disposal claim.  Absent specific evidence as to how the empty CT containers were disposed of at the Milford Facility, the Court is unable to determine whether such disposal was negligent.  Accordingly, the Court finds that Beaver Crossing is precluded from recovering on its negligent disposal theory.

    **B.**    **The Discretionary Function Exception to the FTCA**

The government contends that the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C.

§ 2671 *et seq.*, deprives the Court of subject matter jurisdiction over this case. Congress waived the sovereign immunity of the United States by enacting the FTCA. 28 U.S.C. § 1346(b). The FTCA authorizes suits against the United States for damages caused by the negligent acts or omissions of any government employee while acting within the scope of his or her employment, "under circumstances where the United States, if a private person, would be liable to the claimant . . ." 28 U.S.C. § 1346(b)(1). This broad waiver of sovereign immunity, however, is subject to the discretionary function exception, which provides that the United States shall not be liable for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). To the extent an alleged act falls within the discretionary function exception, a court lacks subject matter jurisdiction. *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 795 (8th Cir. 1998). If governmental actions fall within the discretionary function exception, it is irrelevant whether those actions were negligent. *See Routh v. United States*, 941 F.2d 853, 855 (9th Cir. 1991); *Tippett v. United States*, 108 F.3d 1194, 1199 (10th Cir. 1997); *see also* 14 Charles Alan Wright,

Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3658.1 (3d ed. 1998).

The Supreme Court, in *Berkovitz v. United States*, 486 U.S. 531 (1988), announced a two-part test for determining whether the discretionary function exception applies. *See also United States v. Gaubert*, 499 U.S. 315 (1991). Under part one of the *Berkovitz* test, the Court must determine whether the challenged actions were controlled by mandatory statutes or regulations or whether they were discretionary in nature, that is, involved an element of judgment or choice. *Berkovitz*, 486 U.S. at 536. "Judgment or choice is absent 'when a federal statute, regulation, or policy specifically proscribes a course of action for an employee to follow' because then 'the employee has no rightful option but to adhere to the directive.'" *C.R.S. v. United States*, 11 F.3d 791, 795 (8th Cir. 1993)(quoting *Berkovitz*, 486 U.S. at 536). Thus, if a federal statute, regulation, or policy imposes specific mandatory directives, conduct pursuant to those directives is not discretionary because the employee has no rightful option but to adhere to the directive. *Berkovitz*, 486 at 536. However, if the employee's conduct involves a "matter of choice" or judgment, then the action is discretionary and the Court proceeds to the second prong of the test.

-11-

Under the second prong of the *Berkovitz* test, the Court must determine whether the employee's choice or judgment is the kind of discretion the discretionary function exception was designed to shield. *Berkovitz*, 486 U.S. at 536. The purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Appley Brothers v. United States,* 164 F.3d 1164, 1170 (8th Cir. 1999)(quoting *United States v. Varig Airlines*, 467 U.S. 797 (1984)). "When properly construed, the exception protects only governmental actions and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 315. In applying this prong of the test, the focus "is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id*. at 325. For example, if a government official "drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." *Id.* at n. 7. "When established governmental policy . . . allows a Government agent to exercise discretion, it must be presumed that the

agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. "The plaintiff must rebut this presumption, otherwise the court will presume the decision was based on public policy considerations." *Demery v. U.S. Dept. of Interior*, 357 F.3d 830, 833 (8th Cir. 2004) (internal citations and quotations omitted). With these principles in mind, the Court now turns to the facts in the present case. The Court will apply the discretionary function exception to each of Beaver Crossing's claims in turn.

### 1. Beaver Crossing's Negligent Use Claim

Beaver Crossing alleges that former CCC employees at the Milford Facility sprayed CT directly into rodent burrows and that this use of CT was negligent because it was contrary to CT manufacturers' instructions. Beaver Crossing does not dispute that the CCC's decision to use CT to fumigate rodent burrows during the time the grain storage bin program at the Milford Facility was operated was a matter of discretion. Beaver Crossing asserts, however, that the discretionary function exception is inapplicable because the CCC's discretion to use CT as a burrow fumigant to control rodents, allegedly contrary to manufacturer's instructions, is not grounded in policy, but rather is akin to the every-day discretion a government employee uses in driving a car. For reasons set forth below, the Court disagrees.

As a result of lumber and metal shortages induced by WWII, the USDA CCC, invested significant resources to construct grain storage bins to ensure that the United States had adequate facilities to store grain. In order to preserve the stored grain, the USDA authorized the use of commercial grain fumigants containing CT to control insect infestation. Beaver Crossing does not challenge the CCC's decision to use CT to combat insect infestation. Rather, Beaver Crossing argues that the use of CT for burrow fumigation had to be based on "ordinary, every-day discretion," and not a policy judgment, because USDA publications only authorized the use of CT to control *insect* infestation. This argument is unpersuasive for two reasons. First, there is no evidence in the record that CT was ever specifically used to fumigate rodent burrows at the Milford Facility.

Second, Beaver Crossing's argument is unpersuasive because a CCC employee's decision to use CT for burrow fumigation, assuming burrow fumigation with CT occurred at the Milford Facility, is susceptible to policy analysis. *See C.R.S.*, 11 F.3d at 801 (In determining whether a government employee's discretion was grounded in policy, "the crucial issue is whether the [government employee's] conduct is *susceptible* to policy analysis.")(emphasis added). Rodent infestation, like insect infestation, clearly presented a threat to stored grain. Rodents who gained access to storage bins would not only consume

tremendous amounts of grain, but would also contaminate it with their fecal matter (Ex. 278, Amend. 6, ¶ 42). To prevent and control rodent infestation in stored grain, the CCC recommended fumigating underground rodent burrows with calcium cyanide or other poisonous gases (*Id*. at ¶ 44). The fumigation of rodent burrows with CT, which quickly volatilizes to form toxic, heavier-than-air vapors, would have been consistent with the CCC's established policy of fumigating rodent burrows with poisonous gases. Thus, unlike the every-day discretion involved in operating a car, which clearly cannot be attributed to any regulatory policy, the CCC's decision to use CT for burrow fumigation can be attributed to the identified policies of ensuring that stored grain was preserved and consumable.

      For these reasons, the Court concludes that a CCC employee's decision to use CT for burrow fumigation, assuming that actually occurred, involved the kind of policy judgment that the discretionary function exception was designed to shield. Accordingly, the Court finds that the discretionary function exception to the FTCA deprives the Court of subject matter jurisdiction over Beaver Crossing's claim that the CCC negligently used CT for burrow fumigation at the Milford Facility.

### 2. Beaver Crossing's Private Nuisance Claim

Beaver Crossing's private nuisance claim is premised on the theory that the government's negligent use of CT for burrow fumigation caused groundwater contamination that has created a continuing, private nuisance, interfering with Beaver Crossing's use and enjoyment of its Property. Because Beaver Crossing's continuing nuisance claim is premised on a negligence claim, which the Court has already determined falls within the discretionary function exception, it logically follows that Beaver Crossing's continuing nuisance claim also falls within the discretionary function exception to the FTCA. Accordingly, the Court concludes that it also lacks jurisdiction over Beaver Crossing's private nuisance claim.

### C. Beaver Crossing's Negligent Use Claim

Alternatively, assuming that the Court had jurisdiction over Beaver Crossing's claim that the CCC negligently used CT for burrow fumigation, the Court finds that Beaver Crossing would still be precluded from recovering because Beaver Crossing has failed to sustain its burden of proving that the government breached any duty to Beaver Crossing.

The duty owed by CCC employees at the former Milford Facility to surrounding landowners was a duty to behave like reasonably prudent grain bin operators would have behaved from approximately 1950 to 1974, the period in which the Milford

-16-

Facility was operational.  *See Cerny v. Cedar Bluffs Junior/Senior Public School*, 628 N.W.2d 697, 703-04 (Neb. 2001) (noting that standard of care is generally what the reasonably prudent person would have done under same or similar circumstances).[3]  Having carefully reviewed the record, the Court finds that Beaver Crossing has failed to present sufficient evidence to establish that CCC employees at the former Milford Facility breached any duty to Beaver Crossing for allegedly using CT for burrow fumigation.  Three factors compel this conclusion.  First, Beaver Crossing did not present any evidence demonstrating that CT was ever actually used to fumigate rodent burrows at the Milford Facility.  While Beaver Crossing's witness, Mr. Bill White, who worked at a former CCC facility in Douglas, Nebraska, for a short time during college, testified that he poured CT down rodent burrows at the Douglas Facility, that testimony does not establish that  CT was used to fumigate burrows at the Milford Facility.  Second, both Beaver Crossing's and the government's experts testified that CT was not regarded by the scientific community as an environmental contaminant until the early 1980's.  Both experts also testified that nobody in the scientific community believed during the 1950's, '60's, or '70's that CT would have adverse effects on groundwater if CT came into contact

---

[3] In an action under the FTCA, the Court applies the law of the state in which the acts underlying the complaint occurred.  28 U.S.C. § 1346(b); *Little White Man v. United States*, 2006 WL 1169556 (8th Cir. May 4, 2006).

with the ground because the chemical vaporized so quickly. Third, the fact that the CCC Handbook recommended fumigating rodent burrows with poisonous gases suggests that the United States was unaware at the time that poisonous gases, like CT, could potentially contaminate groundwater. Thus, even if the Court had jurisdiction over this claim, Beaver Crossing would still be precluded from recovering because there is insufficient evidence to support a finding that the CCC breached any duty to Beaver Crossing.

### D. Beaver Crossing's Private Nuisance Claim

Nebraska has adopted the law of nuisance as articulated in the Restatement (Second) of Torts. *Bargmann v. Soll Oil Co.*, 574 N.W.2d 478, 486 (Neb. 1998). Pursuant to Section 822 of the Restatement, one is liable for a private nuisance if his or her conduct is the proximate cause of an invasion of another's interest in the private use and enjoyment of land and the invasion is either (1) intentional and unreasonable or (2) is otherwise actionable under rules controlling liability for negligence or liability for abnormally dangerous activities. Restatement (Second) of Torts § 822 (1977); *see also Bargmann*, 574 N.W.2d at 486 (citing *Hall v. Phillips*, 436 N.W.2d 139, 142 (Neb. 1989).

In the present case, Beaver Crossing claims that the CCC's negligent use of CT for burrow fumigation caused

-18-

groundwater contamination that has created a continuing, private nuisance, interfering with the use and enjoyment of its Property. The parties dispute whether Nebraska law recognizes the tort of continuing nuisance. The Court, however, need not decide that issue here because Beaver Crossing failed to present any evidence that the CCC used, yet alone negligently used, CT to fumigate rodent burrows at the Milford Facility. Therefore, even if the Court had jurisdiction over this claim, Beaver Crossing would still be precluded from recovering because it failed to sustain its burden of proving there was any underlying negligent conduct by CCC employees at the Milford Facility.

## CONCLUSION

In conclusion, the Court finds that Beaver Crossing has failed to sustain its burden of proving that the CCC negligently disposed of CT at the Milford Facility. The Court also finds that the discretionary function exception to the FTCA deprives the Court of subject matter jurisdiction over Beaver Crossing's negligence and private nuisance claims. Alternatively, assuming the Court had jurisdiction over those claims, the Court finds that Beaver Crossing would still be precluded from recovering because it failed to sustain its burden of proving that CT was used for burrow fumigation at the Milford Facility and because there is no evidence establishing that any such use would have

been a breach of the CCC's duty to Beaver Crossing.  A separate order will be entered in accordance with this memorandum opinion.

DATED this 1st day of June, 2006.

BY THE COURT:

/s/ Lyle E. Strom
_____
LYLE E. STROM, Senior Judge
United States District Court